E$^x$ponent®

Exponent
525 W. Monroe Street
Suite 1050
Chicago, IL 60661

telephone 312-999-4200
facsimile 312-999-4299
www.exponent.com

May 3, 2021


Via email:      srhickey@kopkalaw.com


Mr. Stockard R. Hickey III
462 South Fourth Street
Suite 101
Louisville, KY 40202


Subject:   Gonzalez v. Point Logistics
           Exponent Project No. 2103971.000

Dear Mr. Hickey:


I am writing to summarize the work undertaken by Exponent, Inc. in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor of Science Degree in engineering psychology from and performed Honors research in engineering psychology and human factors at Tufts University. I hold a Masters and a Ph.D. in psychology from the Human Factors and Applied Cognition Program from George Mason University. I am a Principal Scientist at Exponent and a member of the Human Factors Practice, where I regularly address how the capabilities and limitations of people interact with the products, equipment, and systems in their environment, and how this interaction affects safety.

My work routinely relates to the analysis and evaluation of human behavior and performance, including issues as to visibility, perception-reaction, the science of risk communication and warnings, attention and control, nighttime and low light perception and vision, and accident avoidance. I have investigated safety issues related to the interaction between human perception, behavior, and environmental conditions. I am actively engaged in research relating to human perception, cognition, and behavior as well as driver behavior. I have published papers and presented at conferences related to human factors issues, including vehicle operator behavior, perceptual information processing, and the effects of interruptions and distractions on performance. I am a

Mr. Stockard R. Hickey III
May 3, 2021
Page 2

member of the Human Factors and Ergonomics Society and SAE International (formerly the Society of Automotive Engineering).

A copy of my resume is attached (Appendix A). A list of the materials I have reviewed to date is also included (Appendix B). In many cases, direct citations are provided in footnotes in the text; however, these footnotes are not necessarily my sole basis for the associated statements. After reviewing the various available materials, I have the following opinions held to a reasonable degree of scientific certainty:

**Incident Description**

On August 27, 2018 an incident occurred at approximately 4:05 a.m. when Mr. Patrick Jean-Louis was traveling northbound on I-65 at mile marker 58.7 in Horse Cave, Hart County, Kentucky.[1] Mr. Jean-Louis was operating a tractor-trailer with a white 2013 Volvo VNL tractor (VIN 4V4NC9EH6DN144987) pulling a 2016 Great Dane trailer (VIN 1GRAP0621GT613302).[2] Mr. Gilberto Gonzalez was also operating a tractor-trailer northbound consisting of a white 2007 Freightliner 6x4 CST 120 Conventional tractor (VIN 1XPBD49X0FD240136) pulling a 2015 Utility Trailer (VIN 1UYV52533FM242301).[3] Mr. Gonzalez struck the rear of Mr. Jean-Louis' trailer, causing Mr. Gonzalez's vehicle to leak fuel.[4] Both vehicles came to a stop, then Mr. Gonzalez's vehicle became engulfed in flames.[5] Mr. Gonzalez was did not exit his vehicle, and he was pronounced deceased at the scene.[6]

The police reconstruction report for the incident describes that prior to the incident, Mr. Jean-Louis stopped at Love's travel stop at Exit 58, and then entered I-65 and accelerated in the right lane.[7] The police reconstruction report created at the time of the incident states that Mr. Jean-Louis estimated he was traveling in the right lane at 50 mph when Mr. Gonzalez merged from the middle lane into the right lane and struck Mr. Jean-Louis at a speed of 62 mph.[8] Keeptruckin vehicle location history data later obtained from Mr. Jean-Louis' vehicle indicates Mr. Jean-Louis stopped at Exit 58 at 3:33 a.m., and re-entered the highway at approximately 3:58 a.m.[9] He then stopped the vehicle approximately 700 feet from the end of the on ramp merge lane for approximately five

---

[1] Kentucky Uniform Police Traffic Collision Report (PR) pp. 1, 2, 4; Kentucky State Police Reconstruction Report (RR) pp. 1, 2, 5, 10; Keeptruckin data points

[2] PR p. 4; RR pp. 1, 5, 7, 8

[3] PR p. 3; RR pp. 4, 6, 8

[4] PR p. 2; RR pp. 1, 10, 18

[5] PR p. 2; RR pp. 1

[6] PR p. 2; RR 1, 12-13

[7] RR p. 8

[8] Initial Kentucky State Police Reconstruction Report (IRR) pp. 1, 9, 14

[9] Keeptruckin data points

Mr. Stockard R. Hickey III
May 3, 2021
Page 3

minutes.[10] He then began to accelerate back into the roadway, up to a speed of
approximately 18-21 mph,  and then came to a stop again after the collision at
approximately 4:05 a.m.[11] Location and speed data from Mr. Gonzalez's vehicle shows
that he was traveling at 62 mph on I-65 for at least 50 minutes before the collision.[12] The
last data point from Mr. Gonzalez's vehicle was at 4:04 a.m., which shows he was
traveling at 62 mph.[13]

**Area of Incident and Conditions**

In the area of the incident, I-65 consists of three lanes each of northbound and
southbound traffic separated by a concrete barrier.[14] The collision occurred
approximately 1200 feet past the end of the merge lane for the Exit 58 on ramp (See
Figure 1 and Figure 2).[15] Conditions at the time of the collision were fair, and lighting
conditions were dark.[16] It was approximately two hours before sunrise.[17] The roadway
has an uphill grade for approximately 1000 feet approaching the area of the collision.[18]

---

[10] Keeptruckin data points; Report of Thomas Rush (Rush Report) p. 6

[11] Keeptruckin data points; Rush Report pp. 3, 7

[12] Haisan Exhibit 2

[13] Haisan Exhibit 2

[14] RR p. 15; Google Earth

[15] Rush Report p. 5

[16] RR p. 3; PR p. 1

[17] SunCalc

[18] Google Earth

Mr. Stockard R. Hickey III
May 3, 2021
Page 4



Figure 1.   Overhead of the incident area and approach on I-65 N. Approximate location of area where Mr. Jean-Louis stopped for five minutes marked by a yellow star. Approximate location of position where both vehicles stopped after the accident marked by a blue star.

Mr. Stockard R. Hickey III
May 3, 2021
Page 5



Figure 2.       Google Earth street view of the Exit 58 on ramp and three northbound lanes.

**Volvo Vehicle**

Photos of the tractor-trailer driven by Mr. Jean-Louis' taken after the incident indicate that it was burned to the point that there is no evidence of the markings and lights on the back of the trailer (e.g. See Figure 3). Photos of the side of the vehicle indicate that retroreflective tape was present on the lower edge of the trailer (Figure 4) in a manner consistent with FMVSS regulations.[19] Photos of the front of the tractor after the incident appear to show that the vehicle's lights were on and functioning (e.g. See Figure 5).[20]

---

[19] FMVSS 108 S5.7.1.4

[20] Kentucky State Police Scene Photos 12-21

2103971.000 – 3912

E*x*™

Mr. Stockard R. Hickey III
May 3, 2021
Page 6



Figure 3.        Kentucky State Police Scene Photo p. 27

Mr. Stockard R. Hickey III
May 3, 2021
Page 7



Figure 4.       Kentucky State Police Scene Photo p. 142

Mr. Stockard R. Hickey III
May 3, 2021
Page 8



Figure 5.        Kentucky State Police Scene Photo p. 14

**Witness Accounts**

*Mr. Patrick Jean-Louis*

Mr. Jean-Louis testified that he was operating the subject vehicle at the time of the incident.[21] He testified that the incident trip began on August 20 in Tennessee.[22] He stated that he was co-operating the vehicle with his partner, Mr. Stanley Pierre, in order to keep the vehicle moving.[23] He stated that he had not taken a break for the ten minutes before the incident and that he had stopped at a Pilot station to get a snack and then kept driving.[24] He confirms that he got back on the highway but does not recall the ramp that he took to do so.[25] With respect to the incident, he stated that the only thing he recalled

---

[21] Deposition of Patrick Jean-Louis (PJL) p. 51

[22] PJL p. 38

[23] PJL p. 41; RR p. 13

[24] PJL pp. 51, 63

[25] PJL p. 52

E$^x$™

Mr. Stockard R. Hickey III
May 3, 2021
Page 9

was that "there were three trucks" and "each of the trucks were in a lane."[26] Mr. Jean-Louis testified that he then heard a noise as if he had a flat tire, and told his partner they had a flat tire.[27] He stated that he and Mr. Stanley then sat in the truck for about five minutes, and then he looked in the rear-view mirror and saw smoke coming from the back of the truck.[28] He testified that they then got out of the truck and saw that there was another truck "in [the] trailer."[29]

Mr. Jean-Louis stated that he spent two days in training provided by Point Logistics, which included components of classroom instruction and on-road evaluation.[30] He also stated that he had received training to pull into a safe spot when pulling off on the highway shoulder, because it is dangerous to pull back out.[31]

*Mr. Daniel Priddy*

Trooper Daniel Priddy was employed as a Kentucky State trooper and served as a collision reconstructionist at the time of the incident.[32] As part of his investigation, Trooper Priddy prepared the Uniform Police Check Accident Collision Report and spoke with Mr. Jean-Louis and his co-driver, Mr. Pierre.[33] Trooper Priddy determined that Mr. Jean-Louis' vehicle was fully established in the right (east) lane of travel before impact occurred.[34] He indicated that he was unable to determine whether Mr. Gonzalez was fully established in the right lane or actively merging from the center lane of travel.[35] Further Trooper Priddy testified that there was nothing blocking Mr. Gonzalez's view of the roadway and that Mr. Gonzalez had a "fairly good" line of sight.[36] Trooper Priddy concluded that Mr. Gonzalez was distracted, inattentive, and/or not in proper control of his vehicle at the time of the incident.[37] He also testified that there was no evidence of pre-impact braking or evasive maneuvers on behalf of Mr. Gonzalez.[38]

---

[26] PJL pp. 50-51

[27] PJL p. 50

[28] PJL p. 50

[29] PJL p. 50

[30] PJL pp. 23, 24, 40

[31] PJL p. 61

[32] Deposition of Daniel Priddy (DP) pp. 4-5, 7, 11

[33] DP pp. 10, 13; RR p. 13

[34] DP pp. 31-32, 67, 107

[35] DP pp. 91, 107

[36] DP p. 46

[37] DP pp. 49-50, 75, 122, 124

[38] DP pp. 41-42, 64, 75, 103, 124

E*x*™

Mr. Stockard R. Hickey III
May 3, 2021
Page 10

Trooper Priddy testified that the police reconstruction report was modified in October or
November of 2020 to include the KeepTruckin GPS coordinate data.[39] According to
Trooper Priddy, the KeepTruckin GPS data indicated that Mr. Jean-Louis pulled over into
the emergency lane slightly north of the exit ramp before merging back onto I-65 prior to
the incident.[40] Based on this GPS data, he calculated that Mr. Gonzalez was
approximately 6,211 feet behind Mr. Jean-Louis when Mr. Jean-Louis began to merge
onto I-65.[41] Trooper Priddy testified that the GPS data appeared accurate to him.[42]

*Ms. Daniela Haisan*

Ms. Daniela Haisan was contracted as a safety consultant for Point Logistics at the time
of her deposition.[43] As a safety consultant, she was involved in the investigation of the
subject incident.[44] Ms. Haisan testified that Point Logistic was using KeepTruckin for its
electronic logbooks at the time of the incident.[45] According to Ms. Haisan, the
KeepTruckin logbooks were connected to the truck via an electronic device; she indicated
that she is not sure if Mr. Jean-Louis used his personal device to connect to the truck.[46]
When asked about the KeepTruckin data,[47] Ms. Haisan testified that KeepTruckin told
her that they did not have GPS data for Mr. Jean-Louis' truck.[48] She also testified that
KeepTruckin told her the data was not a GPS record[49] and that KeepTruckin told her that
their location data was not accurate or that it was not accurate unless it was connected to
the internet.[50] Ms. Haisan also testified that KeepTruckin did not mention the accuracy of
the location data to her.[51] According to Ms. Haisan, KeepTruckin told her that the
location data was collected from the electronic logbook.[52] Based on this information, Ms.
Haisan stated that she disputes, does not have proof, and does not know the accuracy and

---

[39] DP pp. 29-30

[40] DP pp. 29-30, 85

[41] DP pp. 31, 44-45, 64

[42] DP pp. 35-36, 99

[43] Deposition of Daniela Haisan (DH) pp. 6-7

[44] DH p. 10

[45] DH pp. 16-17

[46] DH p. 19

[47] See Haisan Exhibit 1

[48] DH p. 23

[49] DH pp. 20 70-71

[50] DH pp. 25, 31, 39

[51] DH p. 72

[52] DH pp. 69-70, 72

Mr. Stockard R. Hickey III
May 3, 2021
Page 11

validity of the KeepTruckin data.[53] Ms. Haisan stated that neither she nor Point Logistics
is an expert at interpreting location history and GPS information.[54]

Ms. Haisan testified that, based on the Kentucky State Police investigation report, she
believes that Mr. Jean-Louis was driving at the time of the incident.[55] Ms. Haisan stated
that she has no knowledge of, and that there is no evidence that Mr. Jean-Louis pulled
over to the side of the road prior to the incident.[56] She indicates that she does not agree
that the Keeptruckin data show that Mr. Jean-Louis pulled over.[57]

Ms. Haisan testified that Mr. Jean-Louis was not an employee of Point Logistics, but that
he was driving under the authority of Point Logistics.[58] According to her, although Mr.
Jean-Louis was not an employee, Point Logistics provided Mr. Jean-Louis with training,
including training on motor carrier regulations.[59] Ms. Haisan indicated that the
KeepTruckin app in Mr. Jean-Louis' truck provides an alert to the driver 15 to 30 minutes
prior to a driver reaching eight hours of on-duty time, which would be a violation of
motor carrier regulations.[60] She states that Mr. Jean-Louis was not in violation of hours
of service at the time of the incident.[61]

**Human Factors Literature and Analysis**

To evaluate the subject incident from a human factors perspective, I present scientific
literature relevant to driver visual behavior and perception response time. Finally, in
consideration of these findings, I summarize my analysis of the subject incident.

*Visual Cues Available to Drivers*

Drivers rely heavily on task-relevant visual cues to assist in the performance of the driving
task. Compared to daytime driving, visual capabilities decrease at night because less
visual information is available to drivers.[62] At nighttime, drivers tend to look in the area
illuminated by headlamps, ahead of the vehicle in the vicinity of the centerline.[63]
Furthermore, the duration of fixations are generally longer at nighttime compared to

---

[53] DH pp. 24-25, 27, 78, 83-84

[54] DH pp. 30, 78

[55] DH pp. 60, 61

[56] DH pp. 70, 77

[57] DH pp. 70, 78, 84

[58] DH pp. 88, 89

[59] DH pp. 42, 43-44, 89, 93-96

[60] DH pp. 40, 57, 80, 81

[61] DH pp. 81, 86

[62] Krauss, 2015; Olson et al.,1989

[63] Olson et al., 1989

$Ex$™

Mr. Stockard R. Hickey III
May 3, 2021
Page 12

daytime,[64] and drivers' vision is directed more to road edge lines and road surfaces at night.[65] Measures to increase conspicuity, or the likelihood that a given object will be detected, under lower light conditions include increasing the reflectiveness of unlit objects through such means as a bright color and/or red and white retroreflective tape, or the presence of exterior vehicle lights.

Factors that tend to increase conspicuity at night include brightness and contrast, flashing, and uniqueness.[66] Research has shown that under low illumination conditions, hazard conspicuity is a factor relevant to successful detection by a driver. Under these conditions, drivers can detect vehicles with only flashers illuminated on the side of the road from a mean distance of 3,609 feet, while mean detection distance of DOT retro-reflective tape mounted on a board is 3,032 feet.[67] Olson et al., (1992) asked drivers of a passenger vehicle to respond by pressing a button when they saw a "potential hazard," defined as a condition that may cause them to have to alter their speed or direction. When correcting for driver expectancy and different types of DOT retroreflective tape, they estimated that 85% of these drivers would detect and react to the hazard tape in their lane of travel in a dark area at a distance of 900 to 1800 feet.[68] However, the likelihood that an object will be detected depends not only on the characteristics of the object, but also on the characteristics of the observer. For example, an observer's expectations and experience will influence how easily an object is detected and identified,[69] and objects or situations which violate an observer's expectations are likely to be detected more slowly than expected objects or situations.

Another visual cue available to drivers about the relative speed of an object the driver is approaching is called the looming cue. As a person gets closer to an object, the image that object casts on the person's eyes gets bigger, and as a person moves toward an object faster, the image grows more quickly. The point at which an approaching driver can detect that an object, or vehicle, is slow moving or stationary is referred to as the looming threshold. Based on scientific research, this threshold is thought to be approximately 0.0035 or 0.006 radians/second.[70] The variation in the thresholds has been attributed to differences in measurement techniques, but the two values represent a reasonable range of looming threshold estimates.[71]

---

[64] *Ibid.*

[65] Rackoff & Rockwell, 1975

[66] Krauss, 2015

[67] Curry et al., 2007

[68] Olson et al., 1992

[69] e.g., Cole & Hughes, 1984

[70] Mortimer, 1990; Muttart et al., 2005

[71] Muttart, 2021; Krauss, 2015

2103971.000 – 3912

Mr. Stockard R. Hickey III
May 3, 2021
Page 13

Often, when approaching stopped or slowed vehicles, drivers have more than the looming cue available to them, even in nighttime conditions. Information other than looming can be available from cues such as traffic, landmarks in the vicinity of the vehicle, and information known to the approaching driver.[72] For example, drivers are also able to utilize relative lateral position of vehicles they are approaching, even in nighttime conditions when lane lines are not visible beyond a driver's typical headlight throw or before looming cues are available.[73] For instance, Knoblauch and Tobey (1977) found that drivers are able to respond by slowing to the presence of a stopped vehicle on the side of the road with or without flashing lights from a distance of 900 feet.[74]

*Perception Response Time*

Often, an individual must perceive a hazard and produce an appropriate response to avoid an accident or injury. The time it takes to do so, known as the perception-response time (PRT), is typically broken down into four stages: detection, identification, decision, and response.[75] During the detection stage, the driver initially perceives "something" in the environment. This can involve seeing an object in their path of travel or hearing a noise somewhere in the distance. Once the object is detected, the driver must determine whether it represents a hazard. Next, the driver must decide what to do, if anything. If the driver perceives the object as a hazard, some action to avoid the hazard might be taken (e.g., accelerating, braking, steering). After the decision has been made to take some action, the driver must initiate and carry out that action. While it is difficult to calculate precisely the temporal duration of each stage, based on decades of research it is possible to estimate PRTs for various accident scenarios.[76] For example, PRTs in response to highly conspicuous or expected stimuli (e.g., vehicle headlights in a dark roadway environment) tend to be shorter than for less conspicuous or unexpected stimuli (e.g., an unlit vehicle viewed in a dark roadway environment).[77] Scientific literature indicates that an alert and attentive driver is able to respond to a stationary or slow moving, conspicuous vehicle or a vehicle intruding in a driver's path from one lane over at night in 1.2 to 2 seconds.[78]

Driver expectancy is another factor that can alter how one perceives and reacts to driving conditions. Expectancy is shaped by experience and is the anticipation that things will occur or be situated in certain ways. In driving, expectancy relates to a driver's "readiness

---

[72] Muttart, 2021

[73] Knoblach & Tobey, 1977; Muttart, 2021

[74] Knoblach & Tobey, 1977

[75] Krauss, 2015

[76] Krauss, 2015

[77] e.g., Triggs & Harris, 1982; Krauss, 2015; Olson & Sivak, 1986; Triggs & Harris, 1982

[78] Triggs & Harris, 1982; Summala et al., 1981; Muttart, 2017

Mr. Stockard R. Hickey III
May 3, 2021
Page 14

to respond to situations, events, and information in predictable and successful ways."[79] This "readiness to respond" is manifested in faster responses to potentially hazardous stimuli. For example, when drivers anticipate encountering an obstacle, they can detect it from further away[80] and are faster to initiate a response[81] than when the obstacle is unexpected. The Kentucky CDL Manual warns drivers to expect hazards from parked and disabled vehicles, slow drivers and on and off ramps.[82] It further states that hazardous vehicle conflicts that require a speed or direction change are likely to occur at "merges (such as turnpike on ramps) and where there are needed lane changes (such as the end of a lane, forcing a move to another lane of traffic.)"[83]

*Human Factors Analysis*

In the subject incident, available evidence does not indicate whether Mr. Jean-Louis had his four-way flashers or turn signal on while stopped or while moving on the shoulder or in the lane of travel. Additionally, photos of Mr. Jean-Louis' trailer from after the incident indicate the back of the trailer was burnt, such that there is no documentation of the presence and position of taillights and retroreflective tape.[84] However, retroreflective tape is present on the side of Mr. Jean-Louis' trailer in a manner consistent with FMVSS regulations.[85] This would indicate that retroreflective tape was also possibly present on the back of the tractor-trailer in a manner consistent with FMVSS regulations. The possible presence of a blinker, hazard lights and additional retroreflective tape or lights would serve to increase the conspicuity of Mr. Jean-Louis' vehicle.

Prior to the incident, Mr. Gonzalez had clear sight lines to the roadway ahead for at least a distance of 4000-4800 feet.[86] When Mr. Gonzalez was at this distance, Mr. Jean Louis began to move his vehicle again from a stop.[87]  Scientific literature indicates that drivers are able to perceive and respond to the presence of retroreflective tape or a disabled vehicle with or without flashers from a distance of 900 feet or greater.[88] When Mr. Gonzalez was 900 feet from the approximate position of the collision, or approximately 10 seconds prior to the collision, Keeptruckin data indicates that Mr. Jean-Louis' vehicle may have been positioned partially on the shoulder and partially in the lane of travel, and

---

[79] Krauss, 2015

[80] e.g., Roper & Howard, 1938

[81] e.g., Olson & Sivak, 1986

[82] Kentucky CDL Manual

[83] *Ibid.*

[84] Police photos, p. 27

[85] Police photos, p. 142; FMVSS 108 S5.7.1.4

[86] Rush Report pp. 7, 8

[87] Rush Report p. 7

[88] Knoblach & Tobey, 1977; Olson et al., 1992; Curry et al., 2007

$Ex$™

Mr. Stockard R. Hickey III
May 3, 2021
Page 15

traveling at a speed of approximately 15 mph.[89] At this time, 900 feet from the collision, Mr. Gonzalez had clear sight lines to Mr. Jean-Louis' tractor-trailer and the presence of retroreflective tape on his vehicle. At a distance of at least 900 feet, the presence and position of Mr. Jean-Louis' vehicle could be perceived as a potential hazard by an alert and attentive driver in the position of Mr. Gonzalez.

Though an alert and attentive driver may be able to perceive a potential hazard at 900 feet or greater, at that distance such a driver will likely not be able to perceive the relative speed, or looming cue, of the vehicle they are approaching. In the incident scenario Mr. Gonzalez was traveling 62 mph for at least 50 minutes prior to the collision.[90] Mr. Rush's analysis indicates that in the last 8 to 10 seconds prior to the collision, Mr. Jean-Louis' vehicle accelerated from approximately 15 mph up to 18 to 21 mph.[91] For a vehicle traveling 62 mph approaching a vehicle traveling between 15 and 20 mph, the looming threshold distance is approximately 295 to 442 feet.[92] As reviewed above, a reasonable perception response time to a hazard such as Mr. Jean-Louis' vehicle is 1.2 to 2.0 seconds.[93] Mr. Rush's analysis indicates that the distance covered during this PRT interval combined with the distance needed to bring Mr. Gonzalez's vehicle to a stop is approximately 328 to 458 feet.[94] This indicates that when relying on the looming cue alone an alert and attentive driver in the position of Mr. Gonzalez would be able to bring his vehicle to a stop or slow the vehicle prior to impact. Additionally, Mr. Gonzalez had cues in addition to looming available to him including the lateral position and movement of Mr. Jean-Louis' vehicle and the possible presence of taillights, retroreflective tape, hazard lights and/or turn signal. Furthermore, this incident occurred in an area 1200 feet past the end of the merge lane associated with the nearby on ramp.[95] As outlined in the Kentucky CDL Manual, it is reasonable to expect slower moving vehicles merging into traffic from an on ramp.[96] When considering these additional cues and the vicinity to the on ramp, an alert and attentive driver in Mr. Gonzalez' position would likely have been able to perceive and react to the presence of Mr. Jean-Louis' slow-moving accelerating vehicle and avoid this incident through braking. That there was no evidence of any pre-impact avoidance braking[97] suggests that Mr. Gonzalez was not acting as an alert and attentive driver at the time of the incident.

---

[89] Rush Report pp. 3, 7

[90] Haisan Exhibit 2

[91] Rush Report pp. 3, 7

[92] Assuming vehicle width of 8.5 feet and looming threshold of 0.003 to 0.006 radians/second

[93] Triggs & Harris, 1982; Summala et al., 1981; Muttart, 2017

[94] Rush Report p. 8

[95] Rush Report p. 5

[96] Kentucky CDL Manual

[97] *e.g.,* DP pp. 41-42, 64, 75, 103, 124; Rush Report pp. 6, 23

Mr. Stockard R. Hickey III
May 3, 2021
Page 16

**Rebuttal of Plaintiff's Expert Mr. Joey Stidham**

Mr. Joey Stidham, in his report, states that the incident collision was caused by Mr. Jean-Louis merging onto I-65 into the path of Mr. Gonzalez at a point in time where it limited the ability of Mr. Gonzalez to avoid colliding with Mr. Jean-Louis.[98] Mr. Stidham states that Mr. Gonzalez would have had a "reasonable expectation" that Mr. Jean-Louis was moving on the shoulder as he approached the rear of his vehicle.[99] He further states that Mr. Gonzalez's headlights would not illuminate the roadway ahead to show the relative position of Mr. Jean-Louis vehicle, other than to know it was to the right of him.[100] Mr. Stidham writes that when Mr. Gonzalez was at a point that he could detect the Jean-Louis truck was in the roadway, he would need to perform a lane change which would take three to seven seconds to plan for.[101] He states that at this point, Mr. Gonzalez was have "surpassed the point of no escape."[102] He further opines that Mr. Jean-Louis failed to perform visual scans and to identify the immediate hazard of the approaching Gonzalez truck.[103] Mr. Stidham cites to a publication by Dr. Muttart which states "the delineation between avoidable and unavoidable events in the higher closing speed events is when the closing speed is 35 mph."[104] In his deposition, Mr. Stidham stated that he did not see any data that Mr. Gonzalez did anything wrong or anything to cause the crash.[105]

In his analysis, Mr. Stidham fails to consider the reasonable expectation of slower moving merging vehicles in the area of an on ramp and merge lane or the full extent of the visual cues available to Mr. Gonzalez. Mr. Stidham states that Mr. Gonzalez would have a reasonable expectation that Mr. Jean-Louis' vehicle was on the shoulder, but does not consider human factors research which indicates that drivers are able to respond by slowing or moving over a lane to the potential hazard of a vehicle on the shoulder from distances of 900 feet or greater,[106] or that drivers can move over a lane as they approach merging traffic such as at on ramps. He further states that Mr. Gonzalez would have needed three to seven seconds to plan for a lane change after perceiving and recognizing the vehicle as a hazard[107], however he does not consider or address the possibility that Mr. Gonzalez could instead brake in response to Mr. Jean-Louis' vehicle. As outlined above, even if Mr. Gonzalez had only the looming cue of the taillights of Mr. Jean-Louis' vehicle, Mr. Gonzalez had sufficient time to brake and avoid or slow his vehicle. Mr.

---

[98] Report of Mr. Joey Stidham (Stidham Report) p. 57

[99] Stidham Report p. 51

[100] Stidham Report p. 51

[101] Stidham Report pp. 51-52

[102] Stidham Report pp. 51-52

[103] Stidham Report p. 59

[104] Stidham Report p. 59

[105] Deposition of Joey Stidham (JS) p. 24

[106] Knoblach & Tobey, 1977; Olson et al., 1992; Curry et al., 2007

[107] Stidham Report pp. 51-52

Mr. Stockard R. Hickey III
May 3, 2021
Page 17

Stidham's conclusion that Mr. Gonzalez "did not cause this collision" [108] is incorrect, and not based on the entirety of the facts or in line with human factors principles.

**Summary of Opinions and Conclusions**

In summary, the opinions in this report are stated to a reasonable degree of scientific certainty and include the following:

- An alert and attentive driver in the position of Mr. Gonzalez had opportunity to avoid the subject incident.
- Mr. Stidham's analysis fails to consider relevant visual and environmental cues available to Mr. Gonzalez and is not in line with human factors principles.

This report summarizes work performed to date and presents the findings resulting from that work. The findings presented herein are made to a reasonable degree of scientific certainty. I reserve the right to supplement this report and to expand, modify, or amplify my opinions based on review of material as it becomes available through ongoing discovery and through any additional work or review of additional work performed by others. If required to testify, I plan to use exhibits created from the materials and analyses referenced in this report to help illustrate the opinions presented herein.

If you have any questions or require additional information, please do not hesitate to contact me at (312) 999-4212 or dcades@exponent.com.

Sincerely,

David M. Cades, Ph.D.
Principal Scientist

Appendices (3)

---

[108] JS p. 24

2103971.000 – 3912

E$x$™

Mr. Stockard R. Hickey III
May 3, 2021
Page 18


**Demonstrative Exhibits for Deposition and Trial**

At this time, I have not completed preparation of final exhibits for deposition or trial.
If needed, I expect that the exhibits may include, but not be limited to, my report and
the materials listed in the body and/or provided in the attached appendices,
photographs, videos, and results from my analysis described above. Additional
demonstrative exhibits may be prepared when necessary to adequately illustrate and
explain the technical details of the analysis, findings, or opinions to the jury.

Exponent bills my time for all work performed in 2021 at $390/hour. A copy of my
current curriculum vitae is provided in Appendix A.

## Appendix A

**Curriculum Vitae of
David M. Cades, Ph.D.**



**David M. Cades, Ph.D.**

Principal Scientist | Human Factors
525 W. Monroe St., Suite 1050 | Chicago, IL 60661
(312) 999-4212 tel | dcades@exponent.com

## Professional Profile

Dr. Cades specializes in human factors investigations of vehicle and aircraft operator behavior, including perception response time, visual perception, nighttime visibility, and distractions and has investigated the effects of advanced driver assistance systems (ADAS) and highly automated vehicles (HAVs) on driver behavior. He also has expertise in the evaluation and development of warnings and instructions for a wide range of consumer and industrial products. He utilizes his background in human factors and usability testing to support his work in these areas. He received his Ph.D. in Human Factors and Applied Cognition from George Mason University in 2011.

At Exponent, Dr. Cades has investigated vehicle operator behavior of automobiles, commercial trucks, bicycles, motorcycles, and aircraft. He has evaluated the adequacy of warnings on products and in their manuals and he has applied his experience to projects involving safety- and health- related user behaviors of industrial equipment, kitchen appliances, video game entertainment systems, consumer electronics, sports and recreation equipment, home theater products, and personal protective equipment.

Dr. Cades has expertise in the testing and analysis of how interruptions and distractions affect performance. He has investigated the negative effects of distractions in environments, including, but not limited to, driving, aviation, healthcare, offices, and classrooms. He has applied this knowledge to see how distractions can cause errors that lead to accidents. With respect to aviation, specifically, he has collected over forty hours of data from airline pilots performing safety critical flight tasks with interruptions and distractions. Dr. Cades has performed on-road evaluation of ADAS including auto-braking, collision mitigation and warning, blind spot indication, and lane departure warning.

Dr. Cades also has expertise in evaluating and designing graphical user interfaces including devices for use in automobiles and aircraft. He has previously been employed in the field of usability and user experience digital product design. He has investigated the effects of manual and voice-activated infotainment devices in automobiles. He also designed a dashboard display to assist drivers in maintaining safe speeds while driving in adverse conditions and explored how aging and glare affect people's driving ability. For commercial aircraft, he has worked with pilots, air traffic controllers, and airline operations in support of FAA's NextGen initiative.

In Dr. Cades's graduate work, he has utilized and presented on various statistical methods and has authored papers on driver behavior with respect to in-vehicle displays and devices, flight deck performance with novel systems and interruptions, the effects of glare on human vision, how attributes of interruptions affect task performance, ways to improve how people handle distractions, interruptions' effects in different environments, and various statistical approaches for predicting and understanding research outcomes.

## Academic Credentials & Professional Honors

Ph.D., Psychology, George Mason University, 2011

M.A., Psychology, George Mason University, 2007

B.S., Human Factors, Tufts University, summa cum laude with high honors, 2003

New Investigator Award from APA Division of Experimental Psychology (Division 3), 2012

NASA Graduate Student Researchers Program grant $30,000 annual, 2008-2011

North American Finalist for Enhanced Safety of Vehicles automotive design competition, 2009

Recipient of the Deflorez Prize in Human Engineering, 2003

## Licenses and Certifications

PADI Certified Open Water Scuba Diver

## Prior Experience

User Experience Consultant, User Centric, 2010

Research Assistant, Lighthouse International, 2003-2005

Usability Engineering Intern, American Institutes for Research, 2002-2003

Human Factors Intern, Electronic Ink, 2001

Human Factors Intern, Verizon Laboratories, 2000-2001

## Professional Affiliations

Human Factors and Ergonomics Society 2001-present

- Computational Modeling Technical Group
- Cognitive Engineering Technical Group
- Aerospace Technical Group
- Surface Transportation Technical Group
- Product Design Technical Group

Society of Automotive Engineering 2011-present

- Voting member of Safety and Human Factors Steering Committee 2015-present

George Mason Human Factors and Ergonomics Society Student Chapter 2005-2011

- President 2006-2007

Human Factors and Ergonomics Society Potomac Chapter Fall 2006-2011

American Psychological Association 2006-present

- Division 21 - Applied Experimental and Engineering Psychology

Usability Professionals Association 2006-2011

Association for Psychological Science 2006-2011

Cognitive Science Society 2008-2011

## Publications

Krake A, Jonas R, Hoyos C, Crump C, Lester B, Cades D, Harrington R. Effects of Training on Learning and Use of an Adaptive Cruise Control System. SAE Technical Paper 2020-01-1033, 2020, doi: 10.4271/2020-01-1033.

Hoyos C, Lester BD, Crump C, Cades DM, Young, D. 2018.  Consumer perceptions, understanding, and expectations of Advanced Driver Assistance Systems (ADAS) and vehicle automation. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting 2018 Sept; 62(1):1888-1892, Sage CA: Los Angeles, CA: SAGE Publications.

Moorman HG, Niles A, Crump C, Krake A, Lester BD, Milan L, Cloninger C, Cades DM, Young D. Lane-keeping behavior and cognitive load with use of lane departure warning. SAE Technical Paper 2017-01-1407, 2017, doi:10.4271/2017-01-1407.

Crump C, Krake A, Lester BD, Moorman HG, Cades DM, Young D. Driver behavior with passive and active vehicle safety system. Proceedings of the Transportation Review Board 2017 Annual Meeting.

Cades DM, Crump C, Lester BD, Reed S, Barakat B, Milan L, Young D. Differing perceptions of advanced driver assistance systems (ADAS). Proceedings of the Human Factors and Ergonomics Society Annual Meeting 2016 Sept; 58(1):265-269.

Kim R, Lester BD, Schwark J, Cades DM, Hashish R, Moorman H,  Young, D.  Gaze behavior during curb approach: The effect of mobile device use. Proceedings of the Human Factors and Ergonomics Society Annual Meeting 2016 Sept; 60(1):1580-1584.

Cades DM, Crump C, Lester BD, Young D. Driver distraction and advanced vehicle assistive systems (ADAS): Investigating effects on driver behavior. 7th International Conference on Applied Human Factors and Ergonomics (AHFE 2016) and Affiliated Conferences; 4th International Conference on Human Factors in Transportation. 2016.

Foroughi CK, Werner NE, McKendrick R, Cades DM, Boehm-Davis DA. Individual differences in working memory capacity and task resumption following interruptions. Journal of Experimental Psychology: Learning, Memory, and Cognition Advance online publication. http://dx.doi.org/10.1037/xlm0000251. 2016, February 15.

Barakat B, Crump C, Cades D, Rauschenberger R, Schwark J, Hildebrand E, Young D. Eye tracking evaluation of driver visual behavior with a forward collision warning and mitigation system. Proceedings, Human Factors and Ergonomics Society Annual Meeting 2015 Sept; 59(1):1321-1325.

Krauss D, Cades D Dewar R. Driver Distraction. In: Forensic Aspects of Driver Perception and Response. 4th Edition. Krauss D (ed), Tucson, AZ: Lawyers and Judges Publishing Company, Inc., 2015.

Cades D, Kim R, Krauss D. In-vehicle technology and the driver. In: Forensic Aspects of Driver Perception and Response. 4th Edition. Krauss D (ed), Tucson, AZ: Lawyers and Judges Publishing Company, Inc., 2015.

Crump C, Cades D, Rauschenberger R, Hildebrand E, et al. Driver reactions in a vehicle with collision warning and mitigation technology. SAE Technical Paper 2015-01-1411, 2015. doi:10.4271/2015-01-1411.

Werner NE, Cades DM, Boehm-Davis DA. Multitasking and interrupted task performance. In: The Wiley Handbook of Psychology, Technology, and Society. Rosen LD, Cheever NA, Carrier LM (eds), John Wiley & Sons, Lrd, Chichester, UK, March 2015; ch22, 436-452. doi:http://onlinelibrary.wiley.com/doi/10.1002/9781118771952.ch22/summary

Crump C, Cades D, Rauschenberger R, Hildebrand EA, Young DE. Dynamic on-road method for evaluation of Advanced Driver Assistance System (ADAS). Proceedings, 3rd Annual World Conference of the Society for Industrial and Systems Engineering, pp. 77-81, San Antonio, TX, October 20-22, 2014. ISBN: 97819384960-2-8.

Perlmutter, S, Cades DM, Heller, MF, Giachetti, RS, Sala JB, Arndt, SA. Effects of mobile technology use on walking. Proceedings, 58th Human Factors and Ergonomics Society Annual Meeting, 2014.

Quartuccio, J, Franz S, Gonzalez, C, Kenner, NM, Cades DM, Sala JB, Arndt, SA, McKnight, PE. Seeing is believing: The use of data visualization to identify trends for cycling safety. Proceedings, 58th Human Factors and Ergonomics Society Annual Meeting, 2014.

Khan FS, Krauss DA, Alper SJ, Droll J, Arndt SR, Lakhiani SD, Cades DM. Do people heed warnings at gas stations? Proceedings, 2nd Annual World Conference of the Society for Industrial and Systems Engineering, pp. 114-117, Las Vegas, NV, November 5-7, 2013. ISBN: 97819384960-1-1.

Cades DM, Young D, Glazek, K, Nauhaus, G, Alper S. Motorcoach seat belt use rates in the United States. Proceedings, 2nd Annual World Conference of the Society for Industrial and Systems Engineering, pp. 283-288, ISBN: 97819384960-1-1, Las Vegas, NV, November 5-7, 2013.

Werner NE, Cades DM, Boehm-Davis DA, Chang J, Kahn H, Thi, G. Understanding interruption resiliency: Individual differences in spatial ability and working memory capacity in resumption. Proceedings, Human Factors and Ergonomics Society 55th Annual Meeting, 2011.

Cades DM, Boehm-Davis DA, Trafton JG, Monk CA. Mitigating disruptive effects of interruptions through training: What needs to be practiced? Journal of Experimental Psychology: Applied 2011; 17(2):97-109.

Cades DM, Arndt SR, Kwasniak AM. Driver distraction is more than just taking eyes off the road. Institution of Transportation Engineers Journal 2011; 81(7).

Nelson E, Kidd D, Cades D. Examining patterns of simulator sickness during increased exposure to a motion-based driving simulator over time. Journal of the Washington Academy of Sciences 2010; 96(3):1-14.

Werner NE, Cades DM, Boehm-Davis DA, Peterson MS, Alothman SJ, Zhang X. Individual differences in resuming interrupted tasks. Journal of the Washington Academy of Sciences 2010; 96(3):35-49.

Barrow J, Cades D, Kidd D, Nelson E, Roberts D. Managing speed in inclement conditions using an in-vehicle interface. Proceedings, 2nd International Conference on Automotive User Interfaces and Interactive Vehicle Applications, 2010.

Cades DM, Kidd DG, King EB, McKnight PE, Boehm-Davis DA. Factors affecting interrupted task performance: Effects of adaptability, impulsivity, and intelligence. Proceedings, 54th Human Factors and Ergonomics Society Annual Meeting, 2010.

Cades DM, Werner NE, Boehm-Davis DA, Arshad Z. What makes real-world interruptions disruptive? Evidence from an Office Setting. Proceedings, 54th Human Factors and Ergonomics Society Annual Meeting, 2010.

Werner NE, Cades DM, Boehm-Davis DA, Peterson MS, Alothman SJ, Zhang X. Where was I and what was I doing? Individual differences in resuming after an interruption and implications for real-world distractions. Proceedings, Washington Academy of Sciences 2010 Capital Science Conference, 2010.

Nelson E, Kidd DG, Cades DM. The effect of repeated exposures to simulated driving on ratings of simulator sickness. Proceedings, Washington Academy of Sciences 2010 Capital Science Conference, 2010.

Werner NE, Cades DM, Boehm-Davis DA, Peterson MS. Resuming after an interruption: Exploring the roles of spatial and goal memory. Proceedings, Human Factors and Ergonomics Society 53rd Annual Meeting, San Antonio, TX, October 19-23, 2010.

Barrow JH, Cades DM, Kidd DG, Nelson E, Roberts D. SLIC: Speed limit for inclement conditions. Proceedings, 2009 Eye and the Auto Conference hosted by the Detroit Institute of Ophthalmology, Detroit, MI, 2009. (Note that all authors contributed equally).

Cades DM, Jones SM, Werner NE, Boehm-Davis DA. Knowing when to switch tasks: Effectiveness of internal versus external cues. Journal of the Washington Academy of Sciences 2008; 94(3):93-109.

Kidd DG, Cades DM, Horvath DJ, Jones SM, Pitone MJ, Monk CA. Listen up! Do voice recognition systems help drivers focus on the road? User Experience Magazine: A publication of the Usability Professionals' Association 2008; 7(4):10-12.

Cades DM, Werner NE, Trafton JG, Boehm-Davis DA, Monk CA. Dealing with interruptions can be complex, but does interruption complexity matter: A mental resources approach to quantifying disruptions. Proceedings, Human Factors and Ergonomics Society 52nd Annual Meeting, New York, NY, September 22-26, 2008.

Cades DM, Kidd DG, McKnight PE. Where is the real-world variance? A generalizability theory approach to understanding interruptions in naturalistic environments. Abstract, Proceedings, III European Congress of Methodology, pp. 20-21, Oviedo, Spain, July 8-12, 2008.

Kidd DG, Cades DM, McKnight PE. Generalizability theory in laboratory interruptions research: Estimating variance to improve future research. Proceedings, III European Congress of Methodology, pp. 20, Oviedo, Spain, July 8-12, 2008.

Cades DM, Trafton JG, Boehm-Davis DA, Monk CA. Does the difficulty of an interruption affect our ability to resume? Proceedings, Human Factors and Ergonomics Society 51st Annual Meeting, pp. 234-238, Baltimore, MD, October 1-5, 2007.

Cades DM. Measuring individual differences over and above experimental manipulations. Proceedings, International Society for the Study of Individual Differences 13th Biennial Meeting, Giessen, Germany, July 22-27, 2007.

Cades DM, Trafton JG, Boehm-Davis DA. Mitigating disruptions: Can resuming an interrupted task be trained? Proceedings, Human Factors and Ergonomics Society 50th Annual Meeting, pp. 368-371, San Francisco, CA, October 16-20, 2006.

**Presentations**

Werner NE, Cades DM, Boehm-Davis DA, Peterson MS, Alothman SJ, Zhang X. Where was I and what

was I doing? Individual differences in resuming after an interruption and implications for real-world distractions. Presented at research symposium at the University of the District of Columbia (UDC), 2010.

McKnight PE, Kidd DG, Cades DM, Kendra MS. Generalizability theory applications in program and policy evaluation: An introduction and application to quasi-experimental and experimental designs. Presented at Evaluation 2009, 23rd Annual Conference of the American Evaluation Association, 2009. (Symposium - all authors presented equally).

Najab J, Cades DM, Kidd DG. A gentle introduction to Bayesian Analysis. Presented at Evaluation 2009, 23rd Annual Conference of the American Evaluation Association, 2009. (Symposium - all authors presented equally).

Barrow JH, Cades DM, Kidd DG, Nelson E, Roberts D. SLIC: Speed limit for inclement conditions. Paper and Poster presented at Enhanced Safety of Vehicles conference, Stuttgart, Germany, 2009. (Note that all authors contributed equally).

Barrow JH, Cades DM, Kidd DG, Nelson E, Roberts D. SLIC: Speed limit for inclement conditions. Paper presented to National Highway Traffic Safety Administration for design competition of Enhanced Safety of Vehicles conference, Fairfax, VA, 2009. (Note that all authors contributed equally).

Cades DM, Boehm-Davis DA, Trafton JG. Interruptions in the office: An observational field study. Poster presented at the 2007 American Psychological Association Division 21, Division 19, and Human Factors and Ergonomics Society Potomac Chapter Annual Symposium on Applied Experimental Research, Fairfax, VA, 2007.

Krall J, Cades DM, McKnight PE. Predicting baseball winners using just noticeable differences. Poster presented at the 2007 annual conference of the Association for Psychological Science, Washington, D.C., 2007.

Higgins KE, White JM, Cades DM, Ciaccio V, Liu L. Effect of age on transient adaptation at low light levels. Poster presented at Optical Society of America Annual Meeting, Tucson, AZ, 2005.

Higgins KE, White JM, Asami R, Liu L, Rosenthal B, Ciaccio V, Cades DM, Gauthier H. Physiology of glare and readaptation (including age differences). Presented at National Highway Traffic Safety Administration Workshop on Headlamp Safety Metrics: Balancing Visibility and Glare, July 2004.

Higgins KE, White JM, Cades D, Ciaccio V, Liu L. Early dark adaptation: Effect of age. Presented at the annual meeting of The Association for Research in Vision and Ophthalmology (ARVO), May 2006.

**Other Articles**

Scully ID, Scally S, Clark R, Carey MR, Cades DM, Harrington R. Safety and Regulatory Considerations of Advanced Driver Assistance Systems (ADAS). Article in American Bar Association Tort Trial and Insurance Practice Section's Committee News; Fall 2020.

Cades DM, Senatore C, Campbell JL, Harrington R, Wood D. Automated and Assistive Vehicle Technology: Opportunities and Challenges. Article in American Bar Association Tort Trial and Insurance Practice Section's The Brief Fall 2019; 49 (1), pp. 16-25.

Cloninger C, Cades DM, Nauhaus G, Harley E. Reconstructing witnessed events: Sources of error in eyewitness perception and memory. Feature Article in The Illinois Association of Defense Trial Counsel IDC Quarterly 2019; 29 (1).

Cades DM, Skow E, Brinkerhoff RS. Technology advances affecting walking and driving. Common defense: A member publication of Kentucky Defense Counsel, Inc.; Spring/Summer 2017.

Cades DM, Carey MR, Crump C, Cloninger C, Young D. Drivers and driverless vehicle revolution: understanding the changing role of the driver. Westlaw Journal Automotive 36 (24), May 31, 2017.

Cades DM, Crump C, Cloninger C, Young D. Drivers and driverless vehicle revolution: understanding the changing role of the driver. Article at the Defense Research Institute's Product Liability Meeting 2017. Las Vegas, Nevada.

Cades DM, Skow E, Brinkerhoff RS. Understanding the effects of mobile technology on walking and driving. Article in the Michigan Defense Trial Counsel E-Letter; Volume 7, No. 2. 2016.

Cades DM, Brinkerhoff RS, Skow E. Understanding the changing nature of walking and driving. Feature Article in the Iowa Defense Counsel Association Defense Update Summer 2016; Volume XVIII, No. 3.

Cades DM, Arndt, SR, Sala, JB, Krauss, DA. What you need to know about the distracted driver. Feature Article in The Illinois Association of Defense Trial Counsel Quarterly 2013; 23(4).

Khan FS, Cades DM, Krauss, DA. Cyclist and pedestrians vs. cars: Cars win! A human factors perspective. Feature Article in The Illinois Association of Defense Trial Counsel Quarterly 2012; 22(3): 30-33.

Khan FS, Krauss DK, Alper S, Droll JA, Arndt SR, Lakhiani SD, Cades DM. Do people heed warnings at gas stations? In: Newsletter of Michigan Defense Trial Counsel 2012 Spring; 2(4).

Barrow JH, Cades DM, Kidd DG, Nelson E, Roberts D. SLIC: The in-vehicle speed management device. Technical report submitted to judges at National Highway Traffic Safety Administration representing Enhanced Safety of Vehicles design competition. (Note that all authors contributed equally), 2009.

Mintz FE, Smith CF, Cades DM, Fedota J, Henrickson SE. What can I do for you? An evaluation of university and professional organizational roles in the development of student training. Technical report submitted to the executive council of the Human Factors and Ergonomics Society, 2005.

## Peer Reviewer

Reviewer for Journal of Experimental Psychology: Applied, 2010-present

Reviewer for Behavior Research Methods Journal, 2010-present

Reviewer for Human Factors Journal, 2009-present

Reviewer for International Journal of Human Computer Studies, 2008-present

## Appendix B

**List of Materials Reviewed**

## <u>List of Materials Reviewed</u>

- Second Amended Complaint
- Agreed Order Extending Certain Deadlines
- KeepTruckin Terms of Service
- Additional Terms and Conditions for KeepTruckin Services
- Kentucky State Police Records
    - Kentucky State Police Summary with Changes
    - Crime Supplement explaining changes
    - Detail CAD Report Redacted
    - Keeptruckin Vehicle Location History
    - Kentucky State Police Report Redacted
    - Audio Statement of Patrick Jean-Louis 08/27/2018 [180827_0073RED.wav]
    - Total Station Points and Diagram Files
    - Phone and Audio Recordings [218 .wav files]
    - Police Scene Photos [1 .pdf]
- Depositions
    - Gonzalez, Mercedes, 10/08/2020
    - Haisan, Daniela, 11/24/2020 with Exhibits
    - Jean-Louis, Patrick, 10/22/2020 with Exhibits
    - Priddy, Daniel, 02/03/2021
    - Stidham, Joey, 12/15/2020 with Exhibits
- Expert Reports
    - Stidham, Joey, 09/12/2018

**Appendix C**

**References**

# References

Cole, B. L., & Hughes, P. K. (1984). A field trial of attention and search conspicuity. *Human Factors*, *26*(3), 299-313.

Curry, D. G., Nielsen, E. A., Kidd, J. W., & Tuttle, M. R. (2007). Driver detection of roadside obstacles at night. In *Proceedings of the Human Factors and Ergonomics Society Annual Meeting* (Vol. 51, No. 18, pp. 1181-1185). Sage Publications.

49 CFR § 571.108. FMVSS Standard No. 108; Lamps, reflective devices and associated equipment.

Kentucky Commercial Drivers License Manual, Revised July 2014

Knoblauch, R., & Tobey, H. (1980). *Safety aspect of using vehicle hazard warning lights volume 2: Final report.* (No. FHWA/RD-80/102). Department of Transportation.

Krauss, D. (2015). *Forensic Aspects of Driver Perception and Response (4th Ed.).* Lawyers & Judges Publishing Company, Inc.: Tucson, AZ.

Mortimer, R. G. (1990). Perceptual factors in rear-end crashes. In *Proceedings of the Human Factors Society Annual Meeting* (Vol. 34, No. 8, pp. 591-594). Sage CA: Los Angeles, CA: SAGE Publications.

Muttart, J. W., Messerschmidt, W. F., & Gillen, L. G. (2005). *Relationship between relative velocity detection and driver response times in vehicle following situations* (No. 2005-01-0427). SAE Technical Paper.

Muttart, J.W., (2017) *Drivers' responses in emergency situations: A quick reference guide*. Crash Safety Solutions, LLC.

Muttart, J., Kuzel, M., Dinakar, S., Gernhard-Macha, S., Edewaard, D. E., Appow, S., & Dickson, C. (2021). *Factors that Influence Drivers' Responses to Slower-Moving or Stopped Lead Vehicles.*(No. 2021-01-0890). SAE Technical Paper

Olson, P. L. & Sivak, M. (1986). Perception-response time to unexpected roadway hazards. *Human Factors, 28*(1), 91-96.

Olson, P.L., Campbell, K, Massie, D., Battle, D.S., Traube, E.C., Aoki, T., Sato, T., & Pettis, L.C. (1992). *Performance requirements for large truck conspicuity enhancements*. (No, UMTRI-92-8). University of Michigan, Transportation Research Institute.

Olson, P.L., Battle, D.S. & Aoki, T. (1989). *Driver eye fixations under different operating conditions.* (No. UMTRI-89-3). University of Michigan, Transportation Research Institute.

Rackoff, N. J., & Rockwell, T. H. (1975). Driver search and scan patterns in night driving. *Transportation Research Board Special Report*, *156*, 53-63.

Roper, V. J. & Howard, E. A. (1938). Seeing with motor car headlamps. *Transactions of the Illumination Engineering Society, 33*(5), 417-438.

Summala, H. (1981). Drivers' steering reaction to a light stimulus on a dark road. *Ergonomics*, *24*(2), 125-131.

Triggs, T. J., & Harris, W. G. (1982). *Reaction time of drivers to road stimuli.* Melbourne, Australia: Monash University, Department of Psychology.

## Appendix D

**Trial and Deposition List**



## List of Depositions and Trial Testimony for David M. Cades, Ph.D., Last Four Years

### Depositions

1. Dodge M. Shore, Brandi J. Bloor, and Timothy D. Shore v. West Bend Mutual Insurance Company, General Casualty Company of Wisconsin, Hastings Mutual Insurance Company, Tyson T. Holtz, and General Motors LLC v. Grinnell Mutual Reinsurance Company, State of Wisconsin acting through the Department of Health Services, Group Health Cooperative of Eau Claire, and Unity Health Plans Insurance Corporation. February 19, 2021 in the Circuit Court of Dane County, Wisconsin, Case No.: 2018CV001734.

2. Kim Banner, as Personal Representative of the Estate of Jeremy Banner v. Tesla Inc. et al. February 12, 2021 in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No.: 50-2019-CA-009962 (AB).

3. Shirley Bonazzo, Fiduciary of the Estate of Nicole Osborne v. Toyota Motor Corporation, et al. February 3, 2021 in the Superior Court J.D. of Ansonia-Milford, Connecticut, Docket No. AAN-CV-6030031-S.

4. Stephen Bove v. XPO Logistics, LLC., Dejah Xpress LLC., and Kimberly Sanders. January 19, 2021 in the United States District Court for the Southern District of Florida West Palm Beach Division, Case No. 9:20-cv-80945-DMM.

5. Robert W. Steele v. American Honda Motor Co., Inc. December 11, 2020 in the United States District Court for the Eastern District of Michigan Southern Division, Case No. 2:19-cv-11778.

6. In Re: FCA US LLC Monostable Gearshift Litigation. November 6, 2020 in the United States District Court for the Eastern District of Michigan Southern Division, Case No. 16-md-02744-DML-DRG.

7. Carl Erickson v. FCA US LLC, October 29, 2020 in the United States District Court for the Eastern District of Michigan Southern Division – Detroit, Case No. 2:19-cv-12345-DML-DRG.

8. Sophie Mannarino, as Administrator for the Estate of Michael J. Mannarino, a.k.a. Michael J. Mannarino Jr., v. FCA US LLC, and John Does 1-100, August 12, 2020 in the United States District Court for the Eastern District of Michigan Southern Division, Case No.: 2:18-cv-10173-DML-DRG.

9. Ashley Rierson v. David Deveau, Latrice Pla and Abraham Baker and Donald Lassman, as Trustee for David Deveau, March 6, 2020 in the Circuit Court of the

Sixteenth Judicial Circuit in and for Monroe County, Florida, Case No. 11-CA-978-P.

10. Patrice Loyd and De'Andre Baker v. Town and Country Disposal of Western Missouri, LLC et al., January 30, 2020 in the Circuit Court for Jackson County, Missouri at Kansas City, Case No. 1816-CV18405.

11. William Davis v. Randy Johnson and Clark Beverage Group, Inc., January 21, 2020 in the Commonwealth of Kentucky Metcalfe Circuit Court Division 1, Civil Action No. 18-CI-00080.

12. Jeremiah Stroud, et al., v. Kia Motors America, Inc., et al., January 9, 2020 in the Superior Court of the State of California Los Angeles County Central District, Case No. BC705872.

13. Kristi Slusarski and Joan Slusarski v. Siara Rianne Miller, David Lynn Mitchell, and Beaubien Inc., October 8, 2019 in the Circuit Court for the County of Lenawee, State of Michigan, Case No. 2018-5986-NI.

14. Eugene Brown and Anchanette Nathaniel v. Ford Motor Company, September 16, 2019 in the Circuit Court for the County of Wayne, Michigan, Case No. 18-005635-NO.

15. Southern California Regional Rail Authority v. Hyundai Rotem Company, Raul V. Bravo + Associates, Inc., and Does 1 through 10, September 11, 2019 in the Unites States District Court Central District of California, Case No. 16-cv-08042-JAK.

16. Brenda Pfrommer, as administrator of the estate of David W. Judson, deceased, v. Justin Oseland, Mark Fulton, and Sheryl Fulton, August 20, 2019 in the Circuit Court of the Fifth Judicial Circuit of Illinois, Cumberland County, File No. 15-L-3.

17. Charles William King v. Southeastern Freight Lines, Inc.; and Erric Bernard Shingles, February 28, 2019 and March 13, 2019 in the State Court of Gwinnett County State of Georgia, Civil Action File No.: 17-C-05770-1.

18. Sentry Casualty Company and Samantha Chartier and Jonathan Henke, Sr., v. Ramona L. Peterson and State Farm Mutual Automobile Insurance Company. February 25, 2019 in the Circuit Court of Milwaukee County, State of Wisconsin, Case No. 17-CV-11136, Code 30101.

19. In Re: FCA US LLC Monostable Gearshift Litigation. January 25, 2019 in the United States District Court, Eastern District of Michigan, Southern Division, Case No. 16-md-02744.

20. Sandra Mezo, an individual and successor-in-interest to Morton Lavin, and Nadine Groten, an individual and successor-in-interest to Morton Lavin v. FCA US LLC, a Delaware limited liability company; ZF Friedrichshafen AG, a

German limited liability company; Crown Dodge, a California corporation; and DOES 1 through 10, inclusive. January 11, 2019 in the Superior Court of the State of California, County of Ventura, Case No.: 56-2017-00498513-CU-PL-VTA.

21. Charlene Henry, v. Northeast Illinois Regional Commuter Railroad Corporation, d/b/a Metra, a corporation, and BNSF Railway Company. September 14th, 2018 in the Circuit Court of Cook County, Illinois County Department, Law Division, Case No. 16-L-4505.

22. Sandra Lee Linton, by and through her next friend, Thomas Lawrence Linton, and Thomas Lawrence Linton, individually, v. Coca-Cola Bottling Company United, Inc., et al. July 10, 2018 in the Circuit Court of Jefferson County, Alabama Bessemer Division, Case No. CV 2016-900494.

23. Donald Imber, Jr. v. Admiral-Merchants Motor Freight, Inc., and Robert Dale Croff and Raymond John Croff. May 1, 2018 in the Circuit Court for the County of Jackson, Michigan, Case No. 16-1558-NI.

24. Frank Jennison v. Moran Transportation Corporation, Moran Leasing, Inc., and John Hazen. March 27, 2018 in the Circuit Court of Cook County, Illinois, County Department, Law Division. Case No. 15 L 5990 Consolidated with Case NO. 16 L 95.

25. Marianne Romito v. City of Chicago and Sandra Leverett. January 26, 2018 in the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 2013-L-000796.

26. Rhae Bochenek v. Elk Grove Bowl, Inc. December 20, 2017 in the Circuit Court Cook County, Illinois, Municipal Department, Law Division, Case No. 2016-L-004143.

27. William Stefan White v. Transportation Services et al. December 18, 2017 in the United States District Court for the Western District of Kentucky, Civil Action No: 4:16-CV-138-JHM.

28. Charles Tipton; Kelli Johnson and Aaron Johnson; Doreene Christie and James Christie; and Billie Tipton, all individually and on behalf of a Class of persons similarly situated v CSX Transportation, Inc. and Union Tank Car Company. August 8, 2017 in the District Court for the Eastern District of Tennessee Northern Division, Case No 3:15-cv-00311-TAV-CAS.

29. Tarry v. Pitcher and Citizens May 16, 2017 in the Circuit Court for the County of Oakland, State of Michigan, Case No.: 15-150642-NI.

30. Neubauer v. Acuity et al. May 11, 2017 in the Circuit Court for Winnebago County, State of Wisconsin, Case No. 16CV0448; Code: 30101, 30105.

$Ex^x{}^{TM}$

**Trials**

1. Debra Kines and Steven Kines v. Ford Motor Company, and Long Lewis Ford Lincoln of Corinth, Inc., November 3, 2020, in the United States District Court for the Western District of Tennessee Eastern Division at Jackson, Civil Action No. 1:19-cv-01054-JDB-jay.

2. State of Ohio v. Ian Knisley, October 7, 2020 in the Xenia Municipal Court of the State of Ohio, Case No. 19TRD04610.

3. Jeremiah Stroud, et al., v. Kia Motors America, Inc., et al., February 6, 2020 in the Superior Court of the State of California Los Angeles County Central District, Case No. BC705872.

4. Sentry Casualty Company vs. Ramona L. Peterson and State Farm Mutual Automobile Insurance Company. January 14, 2020 in the Circuit Court of Milwaukee County, State of Wisconsin, Case No. 17-CV-11136, Code 30101.

5. State of Michigan v. Craig Bryant Haley. November 16, 2018 in the 36th District Court, State of Michigan, Case No. 18-045868-01 SM.

6. Rhae Bochenek v. Elk Grove Bowl, Inc. May 23, 2018 in the Circuit Court Cook County, Illinois, Municipal Department, Law Division, Case No. 2016-L-004143.

7. The Estate of Brandon Williams, by the special administrator to the estate, Brandon William, Jr., Briana A. Williams, Imarion Williams, Zyere Williams vs. Acuity, a Mutual Insurance Company, N&M Transfer Co., Inc., Christopher F. Chaney, Progressive Universal Insurance Company, Demetrius L. Crawford. December 13, 2017 in the Circuit Court for Milwaukee County, Wisconsin, Case No. 15-CV-4322.

8. Jimi Carr v. Thorntons, Inc. September 28, 2017 in the Circuit Court for Floyd County, State of Indiana, Case No. 22C011508- CT1058.

