# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# BOWLING GREEN DIVISION
# CIVIL ACTION NO. 1:19-CV-00027-HBB

**MERCEDES GONZALEZ, individually,
and as ADMINISTRATRIX of
the ESTATE of GILBERTO GONZALEZ**                                                        **PLAINTIFF**

**v.**

**POINT LOGISTICS, INC., et al.**                                                                   **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Before the Court are cross-motions for summary judgment. Defendant Point Logistics, Inc.'s motion is DN 61. Defendant Patrick Jean-Louis' motion is DN 62. Plaintiff Mercedes Gonzalez's motion is DN 88. Because the motions, responses, and replies overlap, they are globally addressed in this order.[1]

## Legal Standard

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts

---

[1] The pleadings are docketed as follows: Point Logistics' motion for summary judgment is DN 61, Gonzalez's Response is DN 89 and Point Logistics' Reply is DN 95. Jean-Louis' motion for summary judgment is DN 62, Gonzalez's Response is DN 89, and Jean-Louis' Reply is DN 97. Gonzalez's motion for summary judgment is DN 88, Point Logistics' Response is DN 96, Jean-Louis' Response is DN 97, and Gonzalez's Reply is DN 100.

demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## Nature of the Case

On August 27, 2018, Gilberto Gonzales, the husband of Plaintiff Mercedes Gonzalez, was operating a tractor-trailer traveling on Interstate 65, a three-lane highway at the location in question. Defendant Patrick Jean-Louis was operating a tractor-trailer for Point Logistics. The front of Gilberto's truck collided with the rear of the Point Logistics trailer. Both drivers were able to bring their vehicles to a stop, but after a few moments Gilberto's truck began to burn and he, tragically, died in the fire. The parties are in disagreement as to the facts surrounding the contact between the two vehicles. Gonzalez contends the collision happened when Jean-Louis pulled onto the highway from the shoulder. Point Logistics argues that Gilberto was traveling in the center lane, Jean-Louis was traveling in the right lane, and Gilberto collided with the trailer when he drifted from his lane.

Point Logistics' Motion for Summary Judgment that Jean-Louis was an Independent Contractor and Gonzalez's Motion for Summary Judgment on Point Logistics' Vicarious Liability

The tractor unit, which Jean-Louis was driving at the time of the accident, was owned by BI KUL, LLC (DN 83-5 p. 4). BI KUL contracted with Point Logistics for the provision of the tractor unit and drivers. Point Logistics contends that, under Kentucky law, while an employer may be held vicariously liable for the negligent act of an employee, the same is not true where the individual is an independent contractor (DN 61-1 p. 7) (citing Nazar v. Branham, 291 S.W.3d 599, 606 (Ky. 2009)). To this end, Point Logistics directs the Court's attention to the contract with BI KUL, which expressly provides that BI KUL would provide drivers for the tractor unit, and BI KUL's drivers are not employees of Point Logistics (Id.) (citing DN 61-5 p. 12). Point Logistics further notes that the contract specifies that BI KUL has full control over the driver (Id. at p. 8) (citing DN 61-5 at p. 12 ¶18(a)).

Gonzalez contends that Federal Motor Carrier Safety Regulations mandate that a motor carrier such as Point Logistics, which utilizes motor vehicles it does not own, is nonetheless deemed to have control of and responsibility for the operation of those vehicles in compliance with legally mandated safety requirements (DN 88-1 pp. 2, 4, 11-12) (citing 49 C.F.R. § 376.12(c)(1)). To this end, Gonzalez points to a provision in the contract between Point Logistics and BI KUL which provides that Point Logistics assumes complete responsibility for the operation of the equipment for the duration of the agreement (Id. at pp. 4-5, 11-12) (citing DN 61-5 p. 10). These regulations, Gonzalez asserts, create a presumption that a leased driver is an agent or employee of the motor carrier (Id. at pp. 12-13) (citing Bays v. Summit Trucking, LLC, 691 F. Supp. 2d 725, 732 (W.D. Ky. 2010)). Turning to Kentucky agency law, Gonzales argues that vicarious liability is premised on the right to control the agent or employee (Id. at p. 13) (citing Kentucky

Unemployment Ins. Comm'n v. Landmark Cmty Newspapers of Ky., 91 S.W.3d 575, 579-80 (Ky. 2002); Nazar v. Branham, 291 S.W.3d 599, 607 (Ky. 2009)). Gonzalez concludes that the "statutory employee doctrine does not supplant agency law, but instead the federal laws *require* motor carriers to retain control over their drivers, regardless of whether a driver is labeled as an 'independent contractor' in the lease agreement" (Id.) (emphasis in original). As to Point Logistics' actual control over Jean-Louis, Gonzales notes that Point Logistics actively monitored his driving to ensure that he was not in violation of any regulations and that his driver's logbook was accurate (Id. at pp. 14-15) (citing DN 61-6 pp. 17,18, 21, 22, 42, 43, 44). Gonzalez states that Jean-Louis testified that he applied for employment directly with Point Logistics (Id. at pp. 15-16) (citing DN 83-7 pp. 19-20) and characterizes Point Logistics' own documents as demonstrating that it "hired" him (Id. at p.16) (citing DN 88-5 Bates No. 00031, 00032, 00034, 00037-46, 00047-60).

Point Logistics confronts Gonzalez's reliance on the Federal Motor Carrier Regulations by highlighting a section, which follows the portion which Gonzales relies upon, which specifically addresses whether it should be interpreted as nullifying the possibility that a driver could be an independent contractor (DN 96 p. 3) (citing 49 C.F.R. § 376.12(c)(4)). The section reads:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4).

Moreover, Point Logistics states that the regulations in issue relate to motor carrier leasing regulations designed to promote the enforcement of equipment regulations (DN 96 p. 2-3). To

4

this end, Point Logistics notes that the regulation specifies that he lease provides it with "exclusive possession, control and use of the **equipment** for the duration of the lease" (Id. at p. 3) (quoting 49 C.F.R. § 376.12(c)(1) (emphasis added)). In compliance with this requirement, Point Logistics directs the Court's attention to a provision in the contract with BI KUL providing that certain provisions were incorporated to satisfy federal law, but in so doing, the contract was not to be interpreted as granting Point Logistics any discretionary control over BI KUL's performance under the agreement, and that Point Logistics was "interested only in the results of the contracted activity between INDEPENDENT CONTRACTOR and CARRIER and not in the means and methods utilized by INDEPENDENT CONTRACTOR to secure those results" (Id.) (quoting DN 61-5 pp. 12-13). To the extent the regulations create any rebuttable presumption, Point Logistics contends that the clear declaration in the contract with BI KUL that its drivers are not Point Logistics' employees rebuts any such presumption (Id. at pp. 3-4).

This Court has previously examined the operation and effect of 49 CFR § 376.12(c)(1) and (4) in Bays v. Summit Trucking, LLC, 691 F. Supp. 2d 725 (W.D. Ky. 2010) and more recently in Certain Underwriters at Lloyd's v. Morrow, No. 1:16-CV-00180-GNS-HBB, 2019 U.S. Dist. LEXIS 130113 (W.D. Ky. Aug. 5, 2019).[2] The purpose of the regulation is to protect the public from tortious conduct by judgment-proof truck-lessor operators by requiring them to assume full direction and control of the vehicles as though they were the owners. Bays, 691 F. Supp. 2d at 731. This has led some courts to construe the regulation as creating an irrebuttable presumption that the carrier was the statutory employer of the individual driving the leased vehicle. *See* id.;

---

2 While both cases are noteworthy for their examinations of the regulations, they are otherwise distinguishable from the present case. They considered whether a driver was engaged within the scope of work for the carrier rather than whether the driver did so as an independent contractor.

Morrow, 2019 U.S. Dist. LEXIS 130113, at *16.  However, the amendment to the regulation at 49 CFR §376(c)(4) lead the court in Morrow to conclude that the regulation "is neutral in its effect on the employer status of a covered carrier."  2019 U.S. Dist. LEXIS 130113, at *17.  Where a lease complies with the applicable regulations, there is only a rebuttable presumption of agency.  Bays, 691 F. Supp. 2d at 731.

Whether an individual is an employee or independent contractor is a question of law when it rests on facts that are substantially undisputed.  Crunk v. Dean Milk Co., No. 3:06-CV-609-DW, 2008 U.S. Dist. LEXIS 47076, at *13 (W.D. Ky. June 17, 2008) (citation omitted).  It is a question of fact if the determination rests on facts that are materially disputed.  Id.  "[A]n independent contractor is one who furnishes a specialized service to produce a predetermined result."  Decker v. Glasscock Trucking Service, Inc., 397 S.W.2d 773, 775 (Ky. 1965) (citation omitted).  The question of whether Jean-Louis was acting as an employee or agent of Point Logistics must be determined under Kentucky agency law.  Kentucky employs the factors set forth in the Restatement (Second) of Agency, § 220(2).  Crunk, 2008 U.S. Dist. LEXIS 47076, at *11.  These include:

> (1) the extent of control which, by agreement, the master may exercise over the details of the work;
>
> (2) whether or not the one employed is engaged in a distinct occupation or business;
>
> (3) the kind of occupation - - whether the work is done under the direction of the employer or by a specialist without supervision;
>
> (4) the skill required in the particular occupation;
>
> (5) whether the employer or the workman supplies the instrumentalities, tools and place of work for the person doing the work;

>(6) the length of time for which the person is employed;
>
>(7) the method of payment, whether by the time or by the job;
>
>(8) whether or not the work is part of the regular business of the employer; and
>
>(9) whether or not the parties believe they are creating the relationship of master and servant.

Id. at *12; Kentucky Unemployment Ins. Comm'n v. Landmark Cmty. Newspapers of Ky., 91 S.W.3d 575, 579 (Ky. 2002). At one time the Kentucky courts considered the chief criteria to be the right to control the details of the work, however this is no longer the case and all of the factors must be considered in the legal analysis, with each case decided on its own particular facts. Crunk, 2008 U.S. Dist. LEXIS 47076 at *13.

Regarding the first factor, the degree of control which Point Logistics could exert, the agreement between BI KUL and Point Logistics is emphatic that BI KUL and its drivers are independent contractors. Nonetheless, the contract provides that Point Logistics is in complete control of the equipment for the duration of the lease. The agreement qualifies this, however, by noting that the provision is only included for purposes of satisfying federal regulations. "This subparagraph is set forth solely to conform with Federal leasing regulations and shall not be used for any other purposes, including any attempt to show control on the part of the CARRIER in order to attempt to classify INDEPENDENT CONTRACTOR or any of its drivers as an employee of CARRIER" (DN 61-5 p. 10 ¶16(a)) (capitalization in original). This is not determinative as the terms of an agreement "will not control if they fly in the face of reality." Crunk, 2008 U.S. Dist. LEXIS 47076, at *16 (citation omitted). Looking to the facts in the case, Point Logistics did not direct Jean-Louis in the route he should take in delivering cargo (DN 61-6 p. 88). Point Logistics

was, however, monitoring the activity of the truck and electronic driver's log to ensure that the driver was complying with regulations, and notified the driver of any violations (Id. at pp. 20-22).

The second factor weighs in Gonzalez's favor. Jean-Louis was driving under Point Logistics' transportation authority (DN 61-6 p. 89). Point Logistics' business relies on the services of drivers to deliver cargo, and thus Jean-Louis, in acting as a driver delivering cargo for Point Logistics, cannot be considered as being engaged in an occupation or business distinct from that of Point Logistics. *See* American Inter-Fidelity Corp. v. Hodge, No. 18-CV-04604, 2020 U.S. Dist. LEXIS 50508, at *10 (N.D. Ill. Mar. 24, 2020) (Driving a truck for a trucking company "was not entirely disjointed" from the business of the trucking company.); Crunk, 2008 U.S. Dist. LEXIS 47076 at *16.

As to the third factor, neither party has presented any evidence as to whether the work of a truck driver in the locality is done by an employee under supervision or by a specialist without supervision.

The fourth factor favors Point Logistics. "First, a significant amount of skill is required to operate a truck. Further, federal and state laws impose licensing requirements for commercial truck drivers." Zents v. Baylor Trucking Co., No. 5:11-CV-1941, 2013 U.S. Dist. LEXIS 52287, at *23 (N.D. Ohio April 11, 2013) (*quoting* Taylor v. BP Express, Inc., 2008 U.S. Dist. LEXIS 95313, at *10 (S.D. Ga. Nov. 24, 2008)).

The fifth factor also weighs in favor of an independent contractor relationship. Point Logistics did not own the tractor unit Jean-Louis drove. Under the contract between BI KUL and Point Logistics, BI KUL was responsible for all expenses associated with the operation of the tractor unit. BI KUL was also responsible for reimbursing Point Logistics for any damage to a

trailer or for cargo claims (DN 61-5). Nothing in the record suggests that Point Logistics supplied any instrumentalities associated with Jean-Louis' driving services.

As to the sixth factor, the length of time of employment, Jean-Louis only drove for Point Logistics from August 15 to August 27, when the accident occurred. However, during that time, although employed by BI KUL, he drove exclusively for Point Logistics (DN 83-7 p. 10). The contract between BI KUL and Point Logistics was for an initial period of 30 days, with automatic renewal for successive 30-day terms unless terminated by either party (DN 61-5 p. 2). This is similar to a carrier contract agreement in Bauer v. Lawson, in which the contract would "continue in effect until terminated." No. 1:02-CV-64-R, 2005 U.S. Dist. LEXIS 7632, at *9 (W.D. Ky. Feb. 24, 2005). The Court concluded that this constituted a long-term agreement and weighed in favor of an employer-employee relationship.

Turning to the seventh factor and the method of payment, the contract specifies that BI KUL would receive 88% of the payments Point Logistics received from its shipping customers (DN 61-5 p. 18). BI KUL, in turn, was responsible for paying the drivers it supplied (Id. at p. 12). This "by the job" method of payment weighs in favor of an independent contractor relationship.

The eighth factor weighs in favor of an employment relationship. Point Logistics has no directly employed drivers (DN 61-6 p. 91). Nonetheless, it is in the shipping business, utilizing contracted trucks and drivers to deliver those shipments. Jean-Louis' operation of the truck to deliver a Point Logistics shipment was part of Point Logistics' regular business. See Bauer, 2005 U.S. Dist. LEXIS 7632 at *9-10.

The final factor looks to whether the parties believe they are engaged in an employment relationship. Here, the contract between BI KUL and Point Logistics makes clear that the

relationship is intended to be that of an independent contractor. What Jean-Louis thought, however, is less clear. Jean-Louis applied directly with Point Logistics for a driving position. His application inquired "what position are you applying for?" to which he responded, "company driver" (DN 88-5 p. 10). Point Logistics conducted a background check and a drug screen. It provided Jean-Louis with driver training and conducted a road test (DN 61-6 p. 89). The training was conducted over two days (DN 61-3 p. 40), but apparently was nominal: "[s]omething that took three hours. They showed you a video, their policy, how they work. How they function." (Id. at p. 23). "They don't hire you to train you. They know you're a truck driver. You drive their truck in their yard, and then you're good to go." (Id.). Point Logistics did not pay for any of the expenses associated with his background check and drug screen (Id. at p. 90). This expense was contractually imposed on BI KUL (DN 61-5 p. 19-20). In sum, Jean-Louis appears to have viewed his relationship with Point Logistics as one of employer-employee. This is significant, because the question is not whether BI KUL was acting as an independent contractor at the time of the accident. Rather, as the driver in this case, the question is whether Jean-Louis was acting as an independent contractor.

Examination of these factors shows that neither party is unequivocally favored. While more factors favor finding an independent contractor relationship, not all factors need be accorded the same weight. Point Logistics provides commercial shipping services. Tractors and drivers are essential to providing those services, yet Point Logistics directly employs no drivers. Instead, it contracts with the owners of tractor units, who provide drivers for those tractors. Driving the tractors is not ancillary to Point Logistics' business of transporting commercial shipments. To the contrary, Jean-Louis was performing a function central to Point Logistics' business. It is

10

unclear exactly how much control Point Logistics exercised over Jean-Louis' operation of the truck. While it did not direct the route he would take in delivering the shipments, it did serve as a dispatcher and actively monitored his movements and driver's log to ensure that he did not violate any regulations and apparently would communicate with him if he did. Given that there is a rebuttable presumption that the tractor was under Point Logistics' exclusive control and possession, the burden rests with Point Logistics to rebut that presumption. It has done so by citing the contract with BI KUL, which is drafted in such a way as to simultaneously recognize its regulatory obligation to assume control of the tractor and yet also vigorously cast the relationship as that of an independent contractor and disavow any control. While the contract language is instructive, it is not controlling. The record is not well-developed on this issue and the undersigned is not persuaded that the evidence, at this juncture, is sufficient to rebut the presumption of control. However, there is a sufficient question of fact that the final decision should be deferred until presentation of evidence at trial. Therefore, Gonzalez's motion for a determination of vicarious liability is likewise deferred.

<u>Point Logistics' Motion for Summary Judgment on Plaintiff's Negligent Hiring Claim</u>

Gonzalez's Complaint asserts two causes of action against Point Logistics: vicarious negligence for the actions of Jean-Louis and negligent hiring and retention of Jean-Louis (DN 1-2 p. 2). As to negligent hiring, Point Logistics cites <u>Ten Broeck Dupont, Inc. v. Brooks</u>, 283 S.W.3d 705, 732 (Ky. 2009) for the proposition that a claim for negligent hiring is predicated on the proof of two facts: (1) the employee was incompetent to perform the assigned duties safely and (2) the employer acted negligently in exercising reasonable care in hiring the employee (DN 61-1 pp. 16-17). Reiterating its earlier argument that Jean-Louis was an independent contractor,

Point Logistics states that, as a non-employer, it cannot be held responsible for negligent hiring, which is only applicable to direct employers (Id. at pp. 17-18) (citing Oakley v. Flor-Shin, Inc., 964 S.W.2d 438, 442 (Ky. Ct. App. 1998)).

Moreover, Point Logic argues there was no foreseeable risk of harm to a third person associated with Jean-Louis' driving services, which is a prerequisite to negligent hiring (Id.) (citing Oakley, 964 S.W.2d at 442). Point Logistics points out the provision in the contract with BI KUL in which it agreed it would provide "safe and competent" licensed commercial drivers (Id. at pp. 18-19) (citing DN 61-5 p. 3). Point Logistics also notes that Jean-Louis held a valid commercial driver's license, passed a road test and pre-employment drug screen, and underwent a prior-employer verification (Id. at pp. 19-20) (citing DN 83-5). He had no prior history of accidents or driving violations, had never tested positive for banned substances, and passed all required driving regulations (Id.) (citing DN 61-3).

Finally, Point Logistics contends that federal preemption bars Gonzalez's negligent hiring claim (Id. at pp. 20-22). Jean-Louis held a valid commercial driver's license (Id.). As such, Point Logistics argues, he was certified by the issuing agency as qualified to operate a commercial motor vehicle (Id.). It cites 49 U.S.C. § 355.25(a) as establishing the supremacy of federal driver qualifications and no state law can impose different standards for minimum qualifications (Id.).

Gonzalez has not addressed this portion of Point Logistics' motion in her response. In a footnote she states, "Plaintiff will voluntarily dismiss the claim for negligent hiring/retention" (DN 88-1 p. 16 n.49). Given Gonzalez's statement in the footnote and her failure to address the issue in her reply, the Court is entitled to consider it a waiver of opposition to that portion of the motion if Point Logistics has satisfied the burden of demonstrating an absence of material fact.

*See* Luttrell v. Ford Motor Co., No. 3:16-CV-762-DJH-CHL, 2018 U.S. Dist. LEXIS 121662, at *5 (W.D. Ky. July 20, 2018). The undersigned concludes that this claim has been waived, and summary judgment is appropriate on Gonzalez's claim for negligent hiring and retention.

Point Logistics' and Jean-Louis' Motion for Summary Judgment on Plaintiff's Negligence Claim

Point Logistics notes Jean-Louis testified that Gilberto Gonzalez rear-ended his trailer and he had not stopped on the shoulder of the highway at any time before the collision (DN 61-1 p. 10) (citing DN 61-3 pp. 54, 55, 59). Point Logistics also characterizes the finding of the police investigation where Jean-Louis was in the right lane and Gilberto merged from the middle lane into Jean-Louis' (Id. at pp.10-11). Gonzalez's theory of the case, that Jean-Louis pulled from the shoulder into Gilberto's, is supported by her expert witness Joseph Stidham (Id.). Point Logistics assails Stidham's opinions as scientifically unsound and constituting nothing more than speculation (Id. at pp. 11-14). Point Logistics advanced a similar argument in a motion in limine to exclude Stidham's testimony pursuant to FED. R. EVID. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) (DN 75).

Gonzalez defends the validity of Stidham's investigation and report and asserts that there is no question of fact whether Jean-Louis pulled from the shoulder, but simply when, and that this is supported at least inferentially by Point-Logistics' own experts (DN 88-1 p. 19-20).

The undersigned denied Point-Logistics' motion in limine to exclude Stidham's opinion testimony (DN 93). The undersigned found that, while Stidham's utilization of GPS data in arriving at his opinions might be subject to challenge as scientifically unreliable, it was nonetheless admissible. There are significant disputed questions of fact regarding the relative movements of the two vehicles in the time leading up to the collision, and summary judgment is not appropriate.

Point Logistics' and Jean-Louis' Motions for Summary Judgment
Based Upon a Superseding Intervening Cause

Point Logistics argues that Gonzalez cannot establish causation between the accident and Gilberto's death (DN 61-1 p. 22). It cites Howard v. Spradlin, 562 S.W.3d 281, 287 (Ky. Ct. App. 2018), for the proposition that causation as an element of a negligence action consists of two components, "but for causation" and proximate cause (Id.). "But for" causation requires the existence of a nexus between the defendant's negligence and the plaintiff's damages such that the event would not have occurred "but for" the defendant's negligence (Id.) (citing Howard, 562 S.W.3d at 287). Proximate causation "captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff's damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability on the defendant" (Id. at p. 23) (quoting Howard, 562 S.W.3d at 287). Turning to the first component, Point Logistics argues that the evidence demonstrates that Gilberto changed lanes and that this was the cause of the accident (Id. at p. 22). Conversely, Point Logistics argues that there is no proof that Jean-Louis' actions resulted in the accident (Id.). Jean-Louis echoes Point Logistics' argument (DN 97 pp. 5-6).

Even if a "but for" showing has been made in this case, Point Logistics turns to the proximate cause component of causation and argues that a superseding intervening cause can break the chain of causation so that an otherwise negligent actor is relieved from liability (Id. at p. 23-24) (citing Patton v. Bickford, 529 S.W.3d 717, 731 (Ky. 2016)). While the act of a third-party may be an intervening cause, it is a superseding cause only when it is "extraordinary" and of an "unforeseeable nature" (Id.) (citing Briscoe v. Amazing Products, Inc., 23 S.W.3d 228, 229 (Ky. Ct. App. 2000)). To this end, Point Logistics argues that, prior to the accident, the National

Highway Transportation Safety Administration issued a recall for certain Daimler Chrysler engines equipped with plastic low-pressure fuels lines which could leak due to fatigue cracks (Id. at p. 24). These fuel leaks could be undetected and increase the risk of ignition from a hot engine (Id.). Point Logistics alleges that Gonzalez was driving a truck subject to the recall, and there is no record indicating that the fuel line had been replaced before the accident (Id.). It further notes that the fire does not appear to have started until several minutes after the accident, and that the medical examiner's report indicates Gilberto died as a result of the fire, not as the result of any blunt trauma sustained in the collision (Id. at p. 24-25). Point Logistics concludes that the defective fuel line caused the fire, and this was a superseding intervening cause of Gilberto's death (Id.). Jean-Louis echoes Point Logistics' argument (DN 97 pp. 5-6).

Gonzalez responds to Point Logistics that its position is both legally and factually unsupported (DN 88-1 p. 21-23). First, Gonzalez contends that Gilberto was driving a truck equipped with a different engine than the one subject to the recall (Id. at p. 22) (citing DN 83-12 p. 12) (Plaintiff's expert witness, Stidham, testified the truck was equipped with the "Detroit Diesel" engine). Moreover, Gonzalez asserts that the defendants have not identified any witness who will testify that any pre-existing condition of Gilberto's truck caused the fire (Id.). As to an intervening cause, Gonzalez argues that a fire resulting from a motor vehicle accident was a foreseeable result of negligence causing the accident (Id.) (citing City of Catlettsburg v. Davis' Adm'r, 74 S.W.2d 341, 343 (Ky. 1934)).

Here, there are significant issues of fact which preclude summary judgment. First, although both Point Logistics and Jean-Louis assert that there is no evidence that Jean-Louis was negligent or that the negligence caused the accident, Gonzalez's accident reconstruction expert, Stidham, has expressed an opinion otherwise. His opinion is that Jean-Louis was stopped on the shoulder of the highway for approximately four minutes and then attempted to merge into the right lane, attaining a speed of approximately 15 miles per hour before the accident (DN 83-3 p. 56). The collision, he opines, resulted from Jean-Louis' merging into Gilberto's path "at a point in time where it limited the ability of Mr. Gonzalez's ability [*sic*] to avoid t [*sic*] colliding with Mr. Jean-Louis" (Id. at p. 57). This evidence creates a question of fact as to whether Jean-Louis did or did not pull onto the highway from the shoulder into Gilberto's path, and, if so, whether this was the cause of the accident.

As to the issue of whether a defective fuel line was the cause of the fire and represents a superseding intervening act, Defendants have only presented evidence that there was a recall of certain Daimler Chrysler engines because they might be susceptible to fuel line leaks. Defendants have not presented any evidence that Gilberto's truck was equipped with such an engine or, more importantly, that a fuel leak from the low pressure fuel line was the cause of the fire.[3] To find either of these to be true would be speculation based upon the present record. "The question of whether an *undisputed* act or circumstance is a superseding cause is a legal issue for the court to resolve and not a factual matter for the jury." City of Florence v. Chipman, 38 S.W.3d 387, 394

---

[3] The undersigned has reviewed the expert reports of both of Defendants' expert witnesses Tom Rush (DN 83-9) and David Cades (DN 83-13) and has not found where either has opined as to the type of engine with which Gilberto's truck was equipped or that a defective fuel line caused the fire.

16

(Ky. 2001) (quoting Fryman v. Harrison, 896 S.W.2d 908, 911 (Ky. 1995) (emphasis added)). Summary judgment on this issue is therefore inappropriate.

Gonzalez's Motion for Summary Judgment for Defendants' Violation of 49 C.F.R. 395.3(a)(3)

Gonzalez argues that the version of 49 C.F.R. 395.3(a)(3)(ii) in effect at the time of the accident prohibited driving if more than 8 hours had passed since the end of the driver's last off-duty or sleeper-berth period of at least 30 minutes (DN 88-1 pp. 5-6, 16-17). She further asserts that the regulation prohibits a motor carrier from requiring a driver to exceed the time limit (Id.).

Gonzalez contends that Jean-Louis went on duty on August 26 at 8:00:04 p.m. and could remain on duty no later than 4:00:04 a.m. on August 27 (Id. at pp. 6, 17). She asserts that Jean-Louis' electronic logbooks show that he stopped at a truck stop where he remained on duty and performed an inspection at 3:33:36 a.m. and resumed driving at 3:57:02 without a break, leaving just three minutes of permissible driving time (Id. at p. 6). Gonzalez points to a statement from Jean-Louis' co-driver who stated that the app on Jean-Louis' phone notified him of an impending driving-time violation (Id.). She refers to the testimony of Point Logistics' expert Rush, who opined that the accident took place around 4:05 or 4:06 a.m., which would be one to two minutes over the time limit for Jean-Louis to drive (Id. at pp. 6-7). The purpose of the regulation, she asserts, is to prevent driver fatigue, which increases the risk of accidents (Id. at p. 16) (citing United States v. Johansson, 249 F.3d 848, 859 (9th Cir. 2001); United States v. Sandhu, 462 F. Supp. 2d 663, 673-74 (E.D. Pa. 2006)). Because the Defendants were in violation of the regulation at the time of the accident, Gonzalez asks the Court to find them subject to liability for negligence *per se* (Id. at pp. 17-18).

Point Logistics opposes Gonzalez's argument for negligence *per se* on three grounds (DN 96 pp. 4-6). First, it argues negligence *per se* does not impose vicarious liability for the acts of an independent contractor (Id. at p.5). Second, it argues that negligence *per se* is inapplicable to the present circumstances (Id. at pp. 5-6). Finally, it argues that Gonzalez is mistaken as to her belief of the facts in the case (Id. at pp. 5-6).

Regarding the doctrine of negligence *per se*, Point Logistics contends that Gonzalez must prove that the statutory violation occurred and that it was the proximate cause of the injury (Id. at 4-5) (citing Hargis v. Baize, 168 S.W.3d 36, 46 (Ky. 2005)). Assuming that Jean-Louis had violated the hours of service regulation, Point Logistics asserts that Gonzalez has not presented evidence showing that driver fatigue played a part in the accident (Id. at p. 5-6). Moreover, Point Logistics disputes that Jean-Louis was in violation of the driving time limitation, arguing that, at the time of the accident, he had only been driving a few minutes over seven hours (Id.).

The undersigned need not make a factual finding as to Jean-Louis' driving time and whether he was in excess of the permitted time, as a violation of the regulation would not constitute a basis for imposition of negligence *per se* liability. In Tassin v. BNK Transp. Inc., the Court rejected an argument that Federal Motor Carrier Safety Regulations could provide a basis for negligence *per se* under Kentucky law. No. 3:19-CV-00064-JHM, 2019 U.S. Dist. LEXIS 88525, at *5-6 (W.D. Ky. May 28, 2019). Specifically, the Court commented:

> Second, the Defendants move for summary judgment on Mr. Tassin's claims for negligence per se—a doctrine under which a defendant can be negligent as a matter of law, or per se, for violating a statute that promotes safety. Kentucky's negligence per se statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." K.R.S. § 446.070.

> The Defendants maintain that Kentucky law does not provide for a negligence per se action due to violations of a federal statute or regulation. [DN 13-1 at 3]. The Defendants are correct. "Kentucky courts have held that the 'any statute' language in KRS 446.070 is limited to Kentucky statutes and does not extend to federal statutes and regulations . . . ." *Young v. Carran*, 289 S.W.3d 586, 589 (Ky. Ct. App. 2008) (citing *T&M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006)). "The Kentucky General Assembly did not intend for KRS 446.070 to embrace the whole of federal laws and the laws of other states and thereby confer a private civil remedy for such a vast array of violations." *Hicks*, 189 S.W.3d at 530. Accordingly, to the extent that Mr. Tassin's negligence per se claim is based on alleged violations of the FMCSR as it stands codified in federal law, that claim must fail and is dismissed.

Id.; *see also* Easterling v. Jones, No. 1:20-CV-00182-GNS, 2021 U.S. Dist. LEXIS 83210, at *5-6 (W.D. Ky. April 30, 2021). Accordingly, Gonzalez's negligence per se claim arising under the FMCSR fails as a matter of law.

## ORDER

**WHEREFORE**, the Motions for Summary Judgment on behalf of Defendants Point Logistics and Jean-Louis (DN 61 and 62) are **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** in favor of Defendants on Gonzalez's claim for negligent hiring and retention, and that claim is dismissed. The remainder of Defendants' motions for summary judgment are **DENIED**. Gonzalez's motion for summary judgment, DN 88, is **DENIED**.

*H. Brent Brennenstuhl*
H. Brent Brennenstuhl
United States Magistrate Judge

July 27, 2021

Copies to:   Counsel of Record